**H & L MESSENGERS, INC., Appellant,**

v.

**CITY OF BRENTWOOD et al., Appellees.**

Supreme Court of Tennessee.

Feb. 12, 1979.

Daniel R. Loftus, Watkins, McGugin, McNeilly & Rowan, Nashville, for appellant.

Robert H. Jennings, Jr., West, Jennings & Allen, Nashville, for appellees.

James R. Kniffen, Barrett, Lenahan, Kniffen & Ray, Nashville, Peter J. Carre, Washington, D. C., for appellee-intervenor, Branch 4, Nat. Ass'n of Letter Carriers, AFL–CIO.

## OPINION

HENRY, Chief Justice.

This declaratory judgment action, filed pursuant to § 23–1101, T.C.A. and Rule 65, Tenn.R.Civ.P., attacks the constitutionality of an ordinance of the City of Brentwood, on the single basis that it contravenes the First Amendment to the Constitution of the United States.

The Chancellor, whose action is more fully set out hereinafter, declared the ordinance valid, after eliding certain portions he considered unconstitutional.

### I.

*Background*

The City of Brentwood, located in the extreme northern portion of Williamson County, has a population of approximately 8,000 persons, and is overwhelmingly residential in character. According to the testimony of one of its elected officials, a constant effort has been made "to maintain a community that is peaceful, dignified, and a comfortable place for people who live there to call home."

Homes are located on lots containing a minimum of one (1) acre. Apartment complexes are not permitted. The overall density factor is on the maximum basis of one family per acre. At least 95% of the residents are employed outside the city. It maintains a small police department and the city's greatest law enforcement problem is housebreaking or burglary.

It would be fair to state that the residents of Brentwood have attempted to establish a city of "quiet seclusion" and a "sanctuary for people." *Village of Belle*

*Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

To further this goal, the governing body of the city adopted the ordinance in question. Its purposes were to prevent litter in yards and streets, to maintain the privacy of residents, and to combat burglary by guarding against accumulations of handbills and other advertising material during extended absences of residents from their homes, thus eliminating indications that the premises were temporarily vacant.

H & L Messengers is engaged in the business of delivering handbills or circulars, and occasionally samples, in Brentwood and surrounding areas. Its *modus operandi* is to place the advertising matter in plastic bags which, in turn, are hung on door knobs or attached to mailboxes by means of rubber bands.

In the year preceding this suit some 30,000 deliveries were made in Brentwood and a substantial number of these involved uninvited entry upon the property owned by citizens of Brentwood.

The proof indicates that it is difficult, if not impossible, for a citizen to have these deliveries discontinued. This delivery method has resulted in advertising handbills and other matter being blown into residents' yards and those of neighbors and upon the streets.

The proof shows, and the Chancellor found, that other advertising methods are available, but the service provided by H & L is substantially cheaper and more efficient. It should be emphasized, however, that H & L does not obtain prior approval or consent to enter upon private property and does not cease deliveries when requested to do so.

Branch 4, National Association of Letter Carriers, AFL–CIO was permitted to intervene in the trial court. The stated interests of this group are job protection and the protection of the good name of carriers who sometimes are charged with complaints based upon H & L's delivery methods.

## II.

### The Ordinance

Sequentially, the ordinance [1] prohibits:

a. Throwing or depositing commercial or non-commercial handbills on any sidewalk, street, or other public place. (Sec. 2)

b. Handing out, distributing, or selling commercial handbills in any public place. (Sec. 2)

c. Throwing or depositing commercial or non-commercial handbills in or on any "temporarily or continuously uninhabited or vacant" private premises. (Sec. 3)

d. Throwing, depositing, or distributing any commercial or non-commercial handbill in or on any private premises, unless delivered to an owner, occupant, or other person on the premises. (Sec. 4)

It permits:

a. The distribution, without charge, of any non-commercial handbill, on any street, sidewalk, or other public place, to any willing recipient. (Sec. 2)

It exempts:

a. Mail, newspapers, religious, and political material from the prohibitions against delivery to vacant or unoccupied premises, but requires that such material be placed on private property "in such a manner as to prevent their being carried or deposited by the elements upon any street, sidewalk or other public place or upon private property." (Sec. 3)

b. Mail, newspapers, religious, and political material are wholly exempt from Section 4, with the result that such items may be thrown, deposited, or distributed on private premises without permission.

In summary:

a. Commercial or non-commercial handbills may not be deposited or thrown upon any street, sidewalk, or other public place, or upon any vacant or unoccupied premises, or distributed to any private premises unless delivered to the owner, occupant, or some other person.

1. The pertinent portions of the ordinance appear as an appendix to this opinion.

b. Commercial handbills may not be distributed in any public place.

c. Mail, newspapers, and political or religious material may be delivered to any private premises, subject to the qualification that if the property is vacant or unoccupied, the material must be placed in such a manner as to prevent litter.

The evident confusion of this incongruous scheme is compounded by the definitions of the terms "commercial handbill" and "non-commercial handbill." We set these out verbatim:

(1) Commercial handbill is any imprinted or written matter, any sample or device, dodger, circular, leaflet, pamphlet, paper, booklet, or any other printed or otherwise reproduced original or copies of any matter of literature.

(a) Which advertises for sale any merchandise, product, commodity, or thing; or

(b) Which directs attention to any business or mercantile or commercial establishment, or other activity, for the purpose of either directly or indirectly promoting the interest thereof by sales; or

(c) Which directs attention to or advertises any meeting, theatrical performance, exhibition, or event of any kind, for which an admission fee is charged for the purpose of private gain or profit; or

(d) Which, while containing reading matter other than advertising matter, is predominantly and essentially an advertisement, and is distributed or circulated for advertising purposes, or for the private benefit and gain of any person so engaged as advertiser or distributor.

\* \* \* \* \* \*

(3) Non-commercial handbill is any printed or written matter, any sample, or device, dodger, circular, leaflet, pamphlet, newspaper, magazine, paper, booklet, or any other printed or otherwise reproduced original or copies of any matter of literature not included in the aforesaid definitions of a commercial handbill or newspaper, but *excluding religious or political printed material.* (Emphasis supplied)

Although the structure of the ordinance indicates an apparent intention to create three categories, viz., commercial, non-commercial, and ideological, the definition of commercial handbills is so broad that it includes virtually every communication that is not purely ideological. Applying technical rules of grammar, the effect of "excluding religious or political printed material" from the definition of non-commercial handbills is to convert such material into commercial handbills, the only other category defined by the ordinance. When read in a more liberal light, the totality of its provisions indicates an intent to divide materials into two categories, i. e., commercial and ideological. Within the context of these definitions, a prospective advertiser or distributor of handbills would be hard put to determine the proper classification of any matter intended for delivery. We are plagued by the same problem.

### III.

#### The Chancellor's Findings

The Chancellor held that:

. . . the ordinance in question was enacted for the purpose of (1) preventing littering on both private and public property, (2) preventing conditions tending to encourage burglaries of temporarily unoccupied premises and (3) protecting the privacy of residents of the city. The Court finds that the ordinance does tend to effect those three purposes.

We concur in these findings.

Adopting the test stated in *Breard v. City of Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951) that constitutionality "turn[s] upon a balancing of the *conveniences between some householders' desire for privacy and the publisher's right to distribute publications* in the precise way that those soliciting for him think brings the best results," (Emphasis supplied) 341 U.S. at 644, 71 S.Ct. at 933, the Chancellor held that:

the public interest in preventing littering and burglaries are substantial and legitimate interests which are effectively served by the ordinance in question and that these interests substantially outweigh the First Amendment rights affected by the ordinance insofar as the rights affected involve commercial communication.

But, said the Chancellor:

> this ordinance undertakes to regulate the delivery of non-commercial handbills . . . in the same manner as it regulates commercial handbills. . . . The definition of "non-commercial handbill" clearly includes communications which are at least arguably religious, political or artistic.

As our discussion indicates, we are not in accord with this portion of the Chancellor's analysis. Ideological materials clearly are exempt from the definition of non-commercial handbills.

Further, the Chancellor says:

> [s]uch non-commercial communications are entitled to the full scope of protection of the First Amendment and this Court is of the opinion that the public interests served by the ordinance are not sufficiently compelling to justify the curtailing of non-commercial communication. This Court is accordingly of the opinion that the ordinance is unconstitutional under the First Amendment insofar as it undertakes to regulate non-commercial handbills as defined in the ordinance.

As heretofore indicated there are definitional problems that make it difficult for us to treat this as a category of speech regulated by the ordinance.

## IV.

### The First Amendment and Commercial Speech

The notion that commercial speech is not protected by the First Amendment was first articulated in *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed.2d 1262 (1942), in an opinion later characterized by Justice Douglas as "casual, almost off

hand" *Cammarano v. United States*, 358 U.S. 498, 514, 79 S.Ct. 524, 534, 3 L.Ed.2d 462, 472 (1959), (Douglas, J., concurring), and classified as distinctly a limited decision in *Bigelow v. Virginia*, 421 U.S. 809, 819, 95 S.Ct. 2222, 2231, 44 L.Ed.2d 600, 610 (1975).

*Bigelow* virtually obliterated the notion of unprotected commercial speech. *Virginia Board of Pharmacy v. Virginia Citizen's Consumer Council*, 425 U.S. 748, 759, 96 S.Ct. 1817, 1824, 48 L.Ed.2d 346, 357 (1976). Specifically leaving open the question of "the extent to which constitutional protection is afforded commercial advertising under all circumstances and in the face of all kinds of regulation," 421 U.S. at 826, 95 S.Ct.at 2235, the Court held that "commercial [speech] enjoys a degree of First Amendment protection." 421 U.S. at 821, 95 S.Ct. at 2232. The Court suggested a balancing test:

> Advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest. (citation omitted) To the extent that the commercial activity is subject to regulation, the relationship of speech to that activity may be one factor, among others, to be considered in weighing the First Amendment interest against the governmental interest alleged. Advertising is not thereby stripped of all First Amendment protection. The relationship of speech to the marketplace of products or of services does not make it valueless in the marketplace of ideas.

\*　　\*　　\*　　\*　　\*　　\*

Regardless of the particular label asserted by the State—whether it calls speech "commercial" or "commercial advertising" or "solicitation"—a court may not escape the task of assessing the First Amendment interest at stake and *weighing it against the public interest allegedly served by the regulation.* 421 U.S. at 826, 95 S.Ct. at 2235

Needless to say this weighing process was lacking in specifics and required much in the way of clarification. Further articulation came within a year when the Supreme

Court announced its decision in *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed. 346 (1976).[2]

Recognizing that *Bigelow* had left undecided the extent to which commercial speech may be regulated and prohibited, the Court said that "[h]ere, in contrast, the question whether there is a First Amendment exception [to] 'commercial speech' is squarely before us." 425 U.S. at 760, 96 S.Ct. at 1825.

Further the Court said:

Our question is whether speech which does "no more than propose a commercial transaction," (citation omitted) is so removed from any "exposition of ideas," (citation omitted) and from " 'truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government,' " (citation omitted) that it lacks all protection. Our answer is that it does not. 425 U.S. at 762, 96 S.Ct. at 1825

The stage having been set, the Court held that "the free flow of commercial information is indispensable" to the public interest. 425 U.S. at 765, 96 S.Ct. at 1827. It did not, however, define commercial speech, and the standard against which its curtailment may be measured remains somewhat nebulous.

The Court framed the test of the validity of regulation in these words:

In concluding that commercial speech, like other varieties, is protected, we of course do not hold that it can never be regulated in any way. *Some forms of commercial speech regulation are surely permissible.* We mention a few only to make clear that they are not before us and therefore are not foreclosed by this case.

There is no claim, for example, that the prohibition on prescription drug price advertising is a mere *time, place, and manner* restriction. We have often approved restrictions of that kind provided they are justified *without reference to the content* of the regulated speech, that they *serve a significant governmental interest,* and that in so doing they *leave open ample alternative channels* for communication of the information. (Emphasis supplied) 425 U.S. at 770–71, 96 S.Ct. at 1830

The Court, however, expressly did not delineate the "proper bounds of time, place, and manner restrictions."

In formulating the above test the Court cited in support of time, place, and manner regulation the case of *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), wherein the Court, on equal protection grounds, struck down an ordinance which outlawed demonstrations near schools except for peaceful labor picketing. The Court held that the distinction between labor picketing and other peaceful picketing is constitutionally impermissible.

Another time, place, and manner decision cited was *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, 10 ALR 2d 608 (1949), wherein the Court upheld, against an attack on first amendment grounds, an ordinance prohibiting the operation on city streets of vehicles equipped with sound amplifiers which emit loud and raucous noises. For other cases involving time, place, and manner regulations, see *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

The case of *Rowan v. United States Post Office*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) has some relevance to the question under consideration. There the Supreme Court upheld a federal statute authorizing a citizen to require that a mailer of pandering advertisements remove his name from its mailing lists and discontinue all future mailings to him. In so holding the Court said:

. . . it seems to us that a mailer's right to communicate must stop at the mailbox of an unreceptive addressee.

\* \* \* \* \* \*

---

**2.** This decision casts doubt upon the continuing relevance of *Breard v. Alexandria*, supra, relied upon by the Chancellor. *See* Sec. III, *supra*.

To hold less would tend to license a form of trespass . . . The ancient concept that "a man's home is his castle" into which "not even the king may enter" has lost none of its vitality . . . 397 U.S. at 736–37, 90 S.Ct. at 1490

Further, the Court said:

We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another. If this prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even "good" ideas on an unwilling recipient. That we are often "captives" outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere. 397 U.S. at 738, 90 S.Ct. at 1491.

We fully realize that a distinguishing characteristic of *Rowan* is that the ban on the delivery and receipt of objectionable matter is invoked by the citizen as opposed to his government; however, its rationale as to a licensed trespass and the uninvited intrusion upon private premises is apropos the case at bar.

A pertinent case cited in *Virginia Board of Pharmacy, supra,* is *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), in which the Court struck down an ordinance prohibiting the display of nude films by a drive-in theater having a screen visible from a public street or place. The basis for the Court's action was that the ordinance discriminates among movies "solely on the basis of content." 422 U.S. at 211, 95 S.Ct. at 2273. Quoting from *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972), the Court said:

[A]bove all else, the First Amendment means that government has no power to restrict expression because of *its message, its ideas, its subject matter, or its content.* (Emphasis supplied) 422 U.S. at 215, 95 S.Ct. at 2275.

A post-*Bigelow* and *Virginia Board of Pharmacy* case relevant to the issue under discussion is *Linmark Associates, Inc. v.*

*Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). The township, concerned with "white flight," enacted an ordinance prohibiting the posting of "For Sale" or "Sold" signs on real estate. On the basis of its impairment of the flow of truthful and legitimate information, the Court struck down the ordinance.

The Court recognized that "laws regulating the time, place, or manner of speech stand on a different footing from laws prohibiting speech altogether," but held that this was not such a regulation. In reaching this decision the Court held (1) that alternative channels of communication were "far from satisfactory," (2) the ordinance was "not genuinely concerned with the place of the speech," (3) it did not act "to restrict a mode of communication that 'intrudes on the privacy of the home,'" and (4) more importantly, it was concerned with "the substance of the information."

## V.

### General Commentary

The notion of protected commercial speech is yet in its early stage of development. This concept of constitutional law, while hinted at in earlier decisions, had its actual origin and its initial articulation in *Bigelow* in 1975. Its complete scope must await further development in future controversies.

There are, however, certain basic principles that have emerged and are now galvanized into general guidelines not likely to undergo significant dilution.

■ All discussion must start with the realistic recognition that commercial speech enjoys a qualified protection under the First Amendment and under Article I, Section 19 of the Constitution of Tennessee. Neither constitutional provision is subject to analysis in terms of absolutes; all basic rights of free speech are subject to reasonable regulation. For instance, no one would dispute the right of a minister, rabbi, or priest to proclaim his religious beliefs and

exhort others to their acceptance; yet even this right is subject to a reasonable regulation. If it were otherwise, a man of faith would be permitted to interfere with other religious services or even to disrupt the orderly process of civil government. Time, place, and manner regulations come into play to regulate a solemn and sacred constitutional privilege. Admittedly, such regulation must not single out speech ·of a particular content for special treatment and must be scrutinized more closely than a restriction not based upon content. *Virginia Board of Pharmacy* makes this clear.

■ The critical question then must be the nature of permissible regulation. All such regulations must serve an important and substantial public interest, wholly divorced from the suppression of free speech. Moreover, restrictions on First Amendment freedoms must be no greater than is essential to the furtherance of that interest. *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

■ All public expression may be subject to reasonable regulation if a legitimate public interest is served. The citizen's first amendment interest must be weighed against the asserted governmental interest.

■ We are instructed by *Virginia Board of Pharmacy* that commercial speech may be regulated as to time, place, and manner, provided the restrictions (1) are justified without reference to the content; (2) serve a significant governmental interest and (3) leave open ample alternative channels of communication. And we are instructed by *Erznoznik* that even a time, place, and manner regulation may not discriminate solely on the basis of content, and that speech may not be restrained because of "its message, its ideas, its subject matter, or its content."

## VI.

### *Conclusions*

■ Although this ordinance is entitled to a presumption of validity, *State, ex rel. Balsinger v. Town of Madisonville,* 222 Tenn. 272, 435 S.W.2d 803 (1968) which might rescue it from some of its vague and overly broad provisions, it has other problems that may place it beyond the legitimate reach of the presumptive lifeline.

If it were not for definitional problems (*see* Section II, *supra* ), so much of Section 2 of the ordinance as is designed to prevent the throwing or depositing of any handbill, irrespective of content, upon any sidewalk, street, or other public place would be constitutional as a content neutral, reasonable time, place, and manner regulation designed to prevent litter. But when read in context, the apparent exemption of ideological speech destroys its content neutrality.

The City of Brentwood was organized, and operates under, the Uniform City-Manager Commission. Sec. 6–1801, *et seq.,* T.C.A. By § 6–1901(22), the city is authorized:

> To define, prohibit, abate, suppress, prevent, and regulate all acts, practices, conduct, business, occupations, callings, trades, uses of property and *all other things whatsoever detrimental, or liable to be detrimental, to the health, morals, comfort, safety, convenience, or welfare of the inhabitants of the city, and to exercise general police powers.* (Emphasis supplied)

This broad statutory conference of power does nothing more than codify the general rules relating to the police powers inhering in Tennessee municipalities.

■ The right to exercise the police power is an attribute of sovereignty, necessary to protect the public safety, health, morals, and welfare, and is of vast and undefined extent. *Davis v. Allen,* 43 Tenn. App. 278, 307 S.W.2d 800 (1957). In exercising this right, municipalities have wide discretion and broad powers. *Porter v. Paris,* 184 Tenn. 555, 201 S.W.2d 688 (1947).

■ Regulating litter on city streets and in public places is a permissible and praiseworthy public purpose. An ordinance designed to accomplish this objective "furthers an important or substantial governmental interest," but its purpose must be

"unrelated to the suppression of free expression." *United States v. O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679.

 So much of Section 2 of the ordinance as bars the distribution or sale of "any commercial handbill in any public place" violates the First Amendment to the Constitution of the United States and Article I, Sec. 19 of the Constitution of Tennessee. The First Amendment embraces not only the right to speak, to publish, and to print, but also the right to circulate, to receive, and to read. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). · Further, this portion of the ordinance is not content neutral.

 Section 3, which prohibits throwing or depositing any commercial or non-commercial handbill in or upon any "temporarily or continuously uninhabited or vacant" premises is void for vagueness. It contains no standards, no criteria and no guidelines. Temporary vacancy can range from the absence of a housewife on a grocery shopping mission to an extended but temporary absence on vacation. There is no yardstick by which it can be determined that premises are continuously uninhabited. A view of a house from its exterior furnishes no indication of habitation or the lack thereof. Indeed, absent an accumulation of handbills and the like, one house looks like another from a standpoint of occupancy.

 It is a constitutional imperative that laws provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited. "Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford,* 408 U.S. at 108, 92 S.Ct. at 2299.

 We further hold that Section 3 of the ordinance is void in the context of an anti-litter ordinance because of the exemption stated therein, in favor of mail, newspapers, religious, and political material. The exemption of mail, which is deposited in receptacles erected for that purpose, and of newspapers, which are delivered pursuant to contract, causes us no concern. The exemption of ideological speech was no doubt prompted by worthy motives; however, such an exception obliterates content neutrality and subjects the entire prohibition to the objection that speech is being restricted or prohibited on the basis of "its message, its ideas, its subject matter, or its content." *Police Department v. Mosley,* 408 U.S. at 95, 92 S.Ct. at 2290. Restrictions, regulations, and exemptions so based are constitutionally offensive whether they be evil or benign.

 Section 4 of the ordinance is in precisely the same category. It not only prohibits throwing, depositing, or distributing commercial or non-commercial handbills in or on any private premises, but goes further, by exempting ideological matter, thereby destroying the content neutrality of the entire section.

With respect to each of these sections containing exemptions in favor of ideological speech, we point out that it is indisputably true that religious tracts or political leaflets cast upon a citizen's property constitute litter to precisely the same extent as circulars advertising groceries. Thus the exemption not only destroys the indispensable content neutrality of the ordinance, but leaves it standing upon a precarious footing from a standpoint of its stated purposes.

We hold that this ordinance violates both the First Amendment to the Constitution of the United States and Article I, Section 19 of the Constitution of the State of Tennessee.

Reversed.

FONES, COOPER, BROCK and HARBISON, JJ., concur.

APPENDIX

ORDINANCE NO. 77–17

(CAPTION OMITTED)

SECTION 1.

\* \* \* \* \* \*

For the purpose of this Section, as amended, the following terms, phrases,

words, and their derivations shall have the meaning given herein. When not inconsistent with the context, words used in the present tense include the future, words used in the singular number include the plural number. The word "shall" is always mandatory and not merely directory.

(1) Commercial handbill is any printed or written matter, any sample or device, dodger, circular, leaflet, pamphlet, paper, booklet, or any other printed or otherwise reproduced original or copies of any matter of literature.

(a) Which advertises for sale any merchandise, product, commodity, or thing; or

(b) Which directs attention to any business or mercantile or commercial establishment, or other activity, for the purpose of either directly or indirectly promoting the interest thereof by sales; or

(c) Which directs attention to or advertises any meeting, theatrical performance, exhibition, or event of any kind, for which an admission fee is charged for the purpose of private gain or profit; or

(d) Which, while containing reading matter other than advertising matter, is predominantly and essentially an advertisement, and is distributed or circulated for advertising purposes, or for the private benefit and gain of any person so engaged as advertiser or distributor.

(2) Newspaper is any newspaper of general circulation as defined by general law, any newspaper duly entered with the Post Office Department of the United States, in accordance with federal statute or regulation, and any newspaper filed and recorded with any recording officer as provided by general law; and, in addition thereto, shall mean and include any periodical or current magazine regularly published with not less than four (4) issues per year, and sold to the public.

(3) Non-commercial handbill is any printed or written matter, any sample, or device, dodger, circular, leaflet, pamphlet, newspaper, magazine, paper, booklet, or any other printed or otherwise reproduced original or copies of any matter of literature not included in the aforesaid definitions of a commercial handbill or newspaper, but excluding religious or political printed material.

(4) Person is any person, firm, partnership, association, corporation, company or organization of any kind.

(5) Private premises is any dwelling, house, building, or other structure, designed or used either wholly or in part for private residential purposes, whether inhabited or temporarily or continuously uninhabited or vacant, and shall include any yard, grounds, walk, driveway, porch, steps, vestibule or mailbox belonging or appurtenant to such dwelling, house, building, or other structure.

(6) Public place is any and all streets, sidewalks, boulevards, alleys or other public ways and any and all public parks, squares, spaces, grounds, and buildings.

SECTION 2. No person shall throw or deposit any commercial or noncommercial handbill in or upon any sidewalk, street or other public place with(in) the corporate limits of the City of Brentwood, Tennessee. Nor shall any person hand out or distribute or sell any commercial handbill in any public place. Provided, however, that it shall not be unlawful on any sidewalk, street, or other public place within the corporate limits of the City of Brentwood, Tennessee, for any person to hand out or distribute, without charge to the receiver thereof, any noncommercial handbill to any person willing to accept it.

SECTION 3. No person shall throw or deposit any commercial or noncommercial handbill in or upon any private premises which are temporarily or continuously uninhabited or vacant.

(a) Exemption for mail, newspapers, religious and political material. The provisions of this section shall not apply to the distribution of mail by the United States, newspapers (as defined herein), and religious and political material except that newspapers and religious and political material shall be placed on private prop-

erty in such a manner as to prevent their being carried or deposited by the elements upon any street, sidewalk or other public place or upon private property.

SECTION 4. No person shall throw, deposit or distribute any commercial or noncommercial handbill in or upon private premises, except by handing or transmitting any such handbill directly to the owner, occupant, or other person then present in or upon such private premises.

(a) Exemption for mail, newspapers, religious and political material. The provisions of this section shall not apply to the distribution of mail by the United States, newspapers (as defined herein), and religious and political material.