FILED

03/20/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 15, 2018 Session

## STATE OF TENNESSEE v. ELLEN BECKER GOLDBERG

**Appeal from the Circuit Court for Williamson County**
**No. II-CR160042   James G. Martin, III, Judge**

———————————————————

### No. M2017-02215-CCA-R3-CD

———————————————————

A jury convicted the Defendant, Ellen Becker Goldberg, of vandalism of property valued at $1,000 or more but less than $10,000, misdemeanor assault, and stalking for offenses committed against her neighbor, who suffered from chronic illness and physical disability.  The Defendant was sentenced to serve three years of supervised probation.  On appeal, the Defendant argues that the evidence was insufficient to prove the value of the vandalized property, the mens rea for vandalism, or ownership of the property; that the evidence was insufficient to support the conviction for assault; that the evidence was insufficient to establish the elements of stalking, particularly in light of the statutory exclusion for constitutionally protected conduct; that the trial court erroneously admitted evidence regarding the value of the vandalized property; and that the Defendant was erroneously sentenced under the incorrect theft statute.  After a thorough review of the record, we conclude that the savings statute in Tennessee Code Annotated section 39-11-112 applies to the revisions to the theft statute in Tennessee Code Annotated section 39-14-105(a).  Accordingly, we remand for resentencing and for the correction of errors on the judgment forms.  In all other respects, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Robert H. Hassell (on appeal), Franklin, Tennessee, and John D. Schwalb (at trial), Franklin, Tennessee, for the Appellant, Ellen Becker Goldberg.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Kim R. Helper, District Attorney General; and Christopher K. Vernon, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

In 2011, the victim, Ms. Kathryn Leonard,[1] moved in next door to the Defendant in a subdivision in Williamson County, Tennessee. The victim suffered from multiple sclerosis and lupus, and she required the use of a walker. The victim maintained a good relationship with most of her neighbors and was an avid gardener despite her limited mobility. Pertinent to the dispute between the neighbors, the victim enjoyed a use easement which extended over a slice of the Defendant's property, and the Defendant resented the victim's use of the easement. Relations between the parties deteriorated, and the victim and other witnesses testified regarding the Defendant's continued harassment of the victim, which culminated in two events: an implicit threat made by the Defendant that she would shoot the victim, and the Defendant's act of spraying some substance on the victim's garden which caused the vegetation to die. The Defendant was charged with vandalism of the victim's garden, with assault related to the threat, and with stalking for other conduct intended to harass the victim.

Mr. Ben Crenshaw, the vice president of design for Southern Land Company, testified that he had helped design the subdivision in which the Defendant and the victim lived. The houses were set close together, and in order to provide a private outdoor space for each house, one side of each house was primarily a blank wall facing a courtyard area of the neighboring house. Due to building codes, the property line did not run directly along the blank wall but was set off by a few feet in order to allow small upstairs windows in the wall. To provide the residents privacy, the builders set up use easements for each home. Accordingly, each lot was both a "benefitted lot" which enjoyed the use of a slice of the neighboring property along the neighbor's blank wall, and a "servient lot," which gave over the use of the corresponding slice of property to the other neighbor's courtyard. The owner of the servient lot was permitted access to the neighbor's courtyard for the purpose of performing maintenance on the structure on the servient lot, but the easement gave the owner of the benefitted lot use and enjoyment of the area and required the owner of the benefitted lot to maintain landscaping. The owner of the benefitted lot was not permitted to install permanent fixtures or trees on the servient lot's property but was permitted to install a fence abutting, but not touching, the neighbor's home. The terms of the easement were that "[t]he Owner of the Benefited Lot shall maintain the plants and lawn covering of the Easement Area to the same degree and

---

[1] Ms. Leonard's first name is spelled both "Cathy" and "Kathy" in the record. We use the spelling from the indictment.

consistent with the landscaping and lawn covering of the Benefited Lot, and in any case subject to and consistent with the [subdivision] Design Code."

Mr. Crenshaw served on the Design Review Committee which approved landscaping on the easements. He testified that the victim had submitted a landscaping plan to the Design Review Committee in 2011, that this plan included an ornamental magnolia, and that the design was approved even though the declarations prohibited trees on the easement. According to Mr. Crenshaw, it was not uncommon for the Design Review Committee to approve miniature trees such as the ornamental magnolia planted by the victim. The Committee merely required the benefitted lot to allow room for maintenance of the servient lot's home. The Design Review Committee likewise approved a fence which the victim installed in 2014. Mr. Crenshaw testified that residents were permitted to have locking fences limiting access to the courtyards.

Mr. Crenshaw testified that he met with the Defendant in 2011 and discussed the installation of a fence in the area of the Defendant's own courtyard. He also explained to her in detail that, in order to use her other neighbor's property for her private courtyard, the Defendant had relinquished to the victim the right to use the slice of property running along the Defendant's blank wall.

Despite her severe health problems, which at one point had confined her to a wheelchair, the victim, through "physical therapy and a lot of determination," was able to live by herself "and most days, able to do pretty well." The victim had suffered numerous falls resulting in broken bones and needed the assistance of a walker. The victim testified that gardening was her passion and that the courtyard on her home was her "sanctuary" and was "where I experience creation." When the victim moved into the subdivision in 2011, she submitted a plan to plant a garden, including an ornamental magnolia, and a deck with a ramp which could accommodate her walker. This plan was approved. The victim confirmed that she had a use easement of approximately three feet of property along the Defendant's wall, which she was responsible for maintaining and landscaping.

When the victim moved into her home, the Defendant and her husband owned the adjacent lot but did not live there. The relationship between the parties was at first cordial, and the victim testified that she would alert the Defendant if she saw workers around the Defendant's house because the Defendant was not living there. The victim shared homegrown produce with the Defendant, and the Defendant's adult daughter, Ms. Laura Goldberg, would stop by to visit her. The victim testified that relations broke down in 2012, when she came out of the shower, walked through her bedroom, and looked out the window to see the Defendant on the victim's back deck, swinging in one of her chairs. The victim went out and asked the Defendant, "[W]hat's going on?" and

the Defendant "pitch[ed]" her arms out and responded, "[I]t's mine, it's all mine, but I like what you've done and I'm not gonna change anything about it." The victim testified that at first she was puzzled by the Defendant's statements but that she later realized that the Defendant was "confused about the use of" the courtyard. The relationship between the victim and Defendant "[i]nstantly changed." The victim began using the lock which had always been on the fence securing the courtyard. In 2014, the Defendant discovered termites in her home, blamed the victim, and demanded money, despite the fact that the victim did not have termites in her own home. The victim decided to replace the fence at the entry to her courtyard in 2014 after approval from the Design Review Committee, but the Defendant opposed the new fence. The victim testified that she wanted to replace the fence to match a remodel of her front porch and because she wanted a built-in lock that could withstand the elements, since the prior lock on the fence would occasionally rust. The victim testified that although the Defendant had not asked for access to the courtyard in previous years, she began demanding access every other week. The Defendant would make an appointment with the victim but would not show up at the appointed times or would use offensive language while she was there.

In July 2014, "[t]hings had gotten very contentious, and [the victim] was frightened," so she installed two cameras on her home, one by the garage and one by the deck. One of these cameras captured the two incidents that were the basis of the assault and vandalism charges.

The first video shows that on June 15, 2015, the victim was working in her garden with the assistance of her walker. The Defendant came out onto an upper-story balcony which stretched along the front of the Defendant's home and which was partially visible from the victim's courtyard, and she began to wash it with a wand attached to a water source. The Defendant spotted the victim and said, "Devil, I rebuke you. Devil, I rebuke you. Say it, Laura; say it." She then said, "Oh, yeah, bang, bang," and gave a gleeful laugh. She made more "bang" noises and then said, "Got a gun. Get my gun, Laura." The victim testified that the Defendant had previously told her that the Defendant owned a gun, but the victim had never seen the gun. The victim was frightened and believed that the Defendant was planning to shoot her. The Defendant repeated, "Devil, I rebuke you" in a sing-song voice. The victim testified that multiple sclerosis had rendered her incontinent and that the Defendant knew she was incontinent. The video shows that the Defendant engaged in a prolonged mockery of the victim's incontinence, saying, "Oh, here goes the diaper. Diaper going down. Go down, diaper. Diaper change! Laura, it's time for a diaper change." The victim, who testified that she only has "one speed," made her way indoors, and after she entered the house, the Defendant stated, "OK, went for a diaper change." The Defendant then began to make shooting noises. She used both hands to mime holding a long gun with the wand she had been using to clean her porch and made shooting gestures at the victim's home.

The victim acknowledged that she was already in the home when the Defendant started making some of the gunfire noises and gestures on June 15th. She acknowledged that she did not call 911 and that she paused to turn off the water after the Defendant told her daughter to get her gun. The victim explained, however, that because of her limited mobility, she was "a sitting duck" and felt that stopping to turn off the water would not have a substantial impact on the time it would take her to reach safety. The video reveals that the victim was standing near the water source when the Defendant referenced the gun, that she immediately attempted to turn her walker around in the small space by the spigot, that she paused to turn the water off, and that she then slowly made her way inside. She agreed that the Defendant could not have come into personal contact with her without going downstairs and coming through a locked gate, but she noted that she feared that the Defendant would shoot her from the upper balcony.

The victim was frightened by this encounter and checked the video from her camera the next day. The June 16th video shows that at 8:15 a.m., the Defendant leaned out of an upstairs window that was adjacent to the victim's garden and used a power washer wand to spray some liquid over the plants in the courtyard. The Defendant gave special priority to the ornamental magnolia tree, spraying it numerous times. The victim identified the Defendant's daughter on the video recording, and described the Defendant's daughter as running back and forth outside the victim's gate "like she is keeping watch out there."

All of the vegetation in the area which the Defendant sprayed died soon after. On June 24, 2015, the victim obtained an estimate from Southern Land Company for the replacement of the plants. Ms. Laura Tomlin, a horticulturalist for Southern Land Company, testified that she was responsible for designing the flowers for the subdivision and that she also consulted with homeowners and conducted educational seminars. She confirmed that the victim's plants near the Defendant's home had been damaged and needed to be replaced. She testified that Southern Land Company would have charged $2,100 to replace the garden. This total included $750 for plants, $150 for soil and mulch, $960 for labor, and $240 for equipment rental. She testified that Southern Land Company would obtain the plants wholesale and then mark the plants up approximately forty percent as part of the installation charge. She said the company was occasionally hired to perform landscaping work in the courtyards of other residents of the subdivision. She acknowledged that she did not know what had been sprayed on the plants.

The victim testified that she ultimately did not use Southern Land Company to replace the plants. Instead, she hired a friend who was a master gardener. The victim paid approximately $760 to replace the garden. She did not replace three azaleas, some black-eyed Susans, and an evergreen. The value of these plants was approximately $120. The victim testified that generally, the replacement plants were not identical to the mature

plants which had been damaged but were smaller and less valuable. The victim summarized that the garden was a "place of respite" for her and that its destruction had a "huge" effect on her.

The victim also testified about the Defendant's continual harassment of her. The indictment charged the Defendant with stalking between the dates of June 15, 2015, and September 30, 2015, and the victim testified about the Defendant's behavior between these dates. After the Defendant's arrest, the Defendant would park in front of the victim's home and "just sit there and stare" or take photographs of the victim while she was on her front porch. The Defendant would sit in the truck with it running for five minutes, making a "menacing face," and then she would move the truck up one foot. This would go on for thirty minutes, with the Defendant "inching up, and staring at me." The victim acknowledged that she did not have video of the Defendant parking in front of her home, but she stated that it was one of "many, many instances" of harassment and that she did not record everything.

In September, the victim arrived home and saw the Defendant and her daughter in their driveway, facing her with their arms on their hips and frightening looks on their faces. The victim called her neighbor, Mr. Jack Monckton, and asked him to walk with her into her home. Mr. Monckton testified that the victim was a "generous, warm person, highest of integrity, and just a delight to have as a neighbor" and that she was teaching him gardening. He generally described the victim as "tough as nail[s]." Mr. Monckton recalled the victim calling him. The victim could barely speak and asked him to come over. She was parked in her driveway, and the Defendant and her daughter were approximately thirty feet away, staring at the victim aggressively. Mr. Monckton described it as "non-verbal intimidation." He interposed his body between them, and the two began staring at him. The Defendant went into her garage and emerged with something long and brown in her hand. His "perception originally" was that the object was a gun, and he was afraid. It took him a "brief moment" to discern that it was not a gun. The Defendant went back to the garage and reemerged with a different object. Mr. Monckton was concerned that she might reemerge with a lethal weapon. He advised the victim to call the police and walked with her into the home at her slow pace. He acknowledged that he never saw the Defendant with an actual gun.

On July 7, 2015, the victim had asked Mr. Steve Poe to install extra cameras on her premises to make sure her home was secure during an upcoming hospital stay. She testified that the Defendant pulled her car up in an alleyway to the victim's parking pad and made "these horrible, crazy, childish faces." Mr. Poe confirmed that he had installed cameras for the victim, whom he described as sweet, personable, and a "very, very nice, nice person." Mr. Poe stated that he was on a ladder and the victim was in her garage when the Defendant stopped her vehicle at the end of the victim's driveway. Mr. Poe felt

that the Defendant's conduct was "harassing," and he saw the Defendant staring at him "with an ominous stare." Mr. Poe saw that the victim was frightened. He acknowledged that the alleyway was a public street.

The video was introduced at trial and showed the Defendant stopping her truck immediately behind the victim's parking pad, so that it blocked the victim's egress. Mr. Poe ran over to the truck and asked, "May I help you?" He then asked, "What are you looking at?" Mr. Poe testified that the Defendant responded, "the trees." The video shows that just as Mr. Poe reached the vehicle, the Defendant quickly drove away.

Officer Marcus Swain testified that he was called to the Defendant's home on July 7, 2015, because she claimed that someone had assaulted her. She was in her garage and would not open the door until the police arrived. The Defendant was hysterical. Officer Swain went to talk with Mr. Poe, the suspect in the assault, but after reviewing the video, he closed the investigation.

The victim testified about another incident in which she, Mr. Monckton, and Ms. Nancy Monckton were having dinner at the subdivision's golf club. The Defendant walked close to their table and growled. Mr. Monckton confirmed that the Defendant walked past their table and made a guttural growl where "you could see her teeth." The victim seemed frightened as the Defendant approached.

Another night, the victim left a meeting of residents early to avoid the Defendant. The Defendant was not parked near the victim but walked to the victim's car while the victim was chatting with someone, glared at the victim, and remained standing by the victim's car. The Defendant did not leave the premises until the victim did.

The Defendant's harassment also included putting up a "onesie" in one of her windows which faced the Defendant's courtyard. The onesie had "waiting on a diaper change" written on it, and the Defendant left it up for six months. In early September, after her arrest, the Defendant put a grim reaper and skulls in a window facing the courtyard, despite the fact that none of the other windows were decorated for Halloween. Officer Swain saw and photographed the onesie, and Mr. Aaron Kenney, the victim's friend, also testified that he saw the onesie.

The victim testified about how the Defendant's conduct had affected her. She went to the police with Mr. Kenney, on June 17, 2015, and she told the police she was afraid the Defendant might kill her. She testified that she found the sum total of the Defendant's acts frightening and that it was "a conglomeration of many events" that led to her fear. The victim was afraid to sleep, afraid the Defendant would shoot her, and was generally "terrified of her." The victim had been seeing a psychologist since her

husband's death but saw the psychologist more frequently due to emotional distress over the harassment. Mr. Monckton confirmed that the victim became afraid to go into her yard, afraid to be alone at night, and felt she could no longer use her garden. Mr. Monckton came over to garden with her "[t]o protect her if she needed me."

The victim testified that Mr. Kenney stayed with her overnight on three occasions due to her fear. Mr. Kenney, a firefighter, confirmed that he spent the night at the victim's home. He described the victim as a "welcoming, warm-hearted woman" who became like family to him and his wife and children. He testified that he noticed in 2015 that she seemed withdrawn, stressed, and fearful, as though she were "a prisoner in her own home." The victim could not enjoy her own garden without being verbally abused, and she used her cameras to ascertain whether it was safe for her to go out. He testified that she had been gaining mobility prior to the harassment, even walking a few steps without a walker, but that after the harassment, her mobility decreased and she did not have the same demeanor or interact as often with friends. Mr. Kenney found the Defendant's behavior "very threatening and scary," even though it was not directed towards him. Mr. Kenney testified that the victim's bedroom did not look out onto her deck, but testified it would be possible to see the deck if the doors were open.

Officer Swain met with Mr. Kenney and the victim at the Franklin Police Department on June 17, 2015. The victim was crying and showed him the videos of the Defendant's acts. Officer Swain went to the victim's home and took a photograph of the onesie in the Defendant's window. He also took photographs of the garden on June 24th, when he observed that the plants that had been sprayed were turning brown and dying. He took more photographs on July 7th. Officer Swain did not know why the digital photograph showed a "date modified" of January 16, 2008, but he stated he had never set the time or date on the camera. He testified that he investigated the possibility of testing the soil to find out what the Defendant had sprayed, but he was not able to find anyone to perform the testing. Officer Swain acknowledged that he did not get a search warrant for a gun at the Defendant's home.

The defense suggested that the plants had died from improper watering. The victim testified that she tried to water the plants to dilute whatever the Defendant had sprayed on them. She also had an automatic irrigation system. However, she denied that the plants died from over-watering, noting that she had been a gardener for years. Ms. Tomlin testified that the plants in the victim's courtyard were not dying from being over-watered because over-watered plants would wilt and smell bad rather than dry and turn brown. She acknowledged seeing some moss in a photograph but stated that it did not appear to be "anything that would damage the home."

- 8 -

The defense attempted to establish that the victim's use of the easement was encroaching on the Defendant's rights. Mr. Crenshaw acknowledged that he met with the victim in her courtyard in 2014 to discuss the ornamental tree and other plants that had grown close to the Defendant's property, but he did not recall requiring the victim to move the tree. He agreed that it was not permissible to drill into the neighbor's foundation to install a fence and that if a fence post cut off a pipe from a downspout, that could interfere with drainage. Ms. Tomlin likewise agreed that the landscapers avoided damaging drainage because it could cause foundation damage. She testified that foster hollies and the ornamental magnolia would grow a maximum of twenty to twenty-five feet high, but that they were slow-growing and easy to control.

A photograph taken from inside the Defendant's daughter's bedroom was introduced, showing the Defendant's daughter holding up a doll and showing a camera on the victim's home visible through the window. The victim acknowledged it was her camera, but she testified that the interior of the bedroom was not visible on the video from the camera.

The Defendant testified that she and the victim were on good terms prior to 2014 and that the event which precipitated the break was the Defendant's suggestion that the victim move into a nursing home. She testified that she noticed stitches on the victim's head and that the victim had told the Defendant that she was falling repeatedly. The Defendant testified that she suggested that the victim should go to a nursing home, and the victim "went ballistic" and began screaming at her. The Defendant testified that the neighbors no longer spoke after this incident. The victim, in her testimony, denied that such a conversation had taken place.

The Defendant attempted to provide innocent explanations for the actions caught on video and testified to by the other witnesses. She stated that she did not own a firearm and denied telling the victim that she had a gun or was a good shot. She testified that she owned a toilet plunger that resembled a rifle and that she was referring to this plunger when she told her daughter to get her gun on the video. She testified that she also owned a toilet brush in the shape of a pistol. The weapon-shaped toilet accessories were introduced into evidence. Regarding the shooting noises and gestures captured on film, the Defendant asserted that she was shooting at birds with her finger and that she was angry with the birds because they had defecated on her porch. She acknowledged during direct examination that the comments about the victim's incontinence were "wrong" and "mean." However, on cross-examination she backtracked, saying that the comments were "[n]ot entirely" aimed at the victim. The Defendant testified that she was "really embarrassed" that her adult daughter played with dolls and implied that the comment about a diaper was made to her daughter in reference to a doll. On cross-examination, she admitted that no one was in the courtyard other than the victim when she said, "Devil,

I rebuke you." She stated that a friend had told her to repeat the phrase when she felt negative feelings or felt afraid.

The Defendant testified that the prior owners of the victim's property would allow her into the courtyard to perform maintenance but that the victim locked the courtyard and denied her access to the property. The Defendant asserted that in the summer of 2015, her home had a severe problem with ants and termites. According to the Defendant, the victim would not allow her to access the courtyard to address the insect problems. The Defendant testified that the video captures her spraying ant and bug killer out of her window and that she sprayed out of the window because she was not permitted to access the courtyard. She testified that she sprayed other areas of her own home with the same chemical and did not harm her own landscaping and that she diluted the spray, which was labeled "not for use on plants," with water. When asked about her act of repeatedly spraying the magnolia tree, she asserted that the tree had ants all over it and that her arm was in a cast, making it difficult to maneuver the sprayer.

The Defendant denied making faces or growling at the victim at the golf club. She said that, given a diagram drawn by Mr. Monckton, she would have had to "like walk on the wall" to go past the victim's table. She also testified that she had had several surgeries on her mouth and said, "If I was doing anything at all, it's probably because my mouth was hurting." The Defendant also denied following the victim to her car after the residents' meeting. She stated at first that she did not know that the victim was at the home owners' association meeting, and she then testified that the victim had left before the Defendant did. She testified that the victim moved slowly and was still in the parking lot when she left but that she was not focused on the victim. The Defendant stated that she parked in front of the victim's house only because her own house was on a curve and she felt it was safer to park on a straightaway. In his testimony, Mr. Crenshaw agreed that the Defendant's house was located in a curve and that it would be difficult for other vehicles to use the road if a car were parked in the curve.

Regarding the incident with Mr. Poe, the Defendant denied making faces at the victim and claimed she was looking at her own home because she was concerned that the victim might have been affixing cameras to the Defendant's house. She acknowledged stopping her car directly in front of the victim's driveway. The Defendant stated that the onesie belonged to her friend's child and must have been washed and hung up. She claimed she did not know that it was in the window and took it down when she realized it was there. She testified that her children wanted to decorate for Halloween and that she did not recall a grim reaper but did recall a small skeleton out front. She stated that the decorations were not directed at the victim.

- 10 -

The Defendant contended that she was simply too busy to stalk the victim. She stated that she spent her time helping her daughter with horses, helping her husband in his medical office, and taking care of another adult daughter who had come to live with her and who had suffered from brain cancer and was left with a visual handicap and memory issues. She also asserted that she had spent the bulk of the time charged in the indictment in Florida.

On May 24, 2017, the jury convicted the Defendant of vandalism, assault, and stalking. The jury fixed the value of the property as $1,000 or more but less than $10,000. The trial court held a sentencing hearing and sentenced the Defendant to concurrent sentences of three years for the vandalism and eleven months and twenty-nine days for each misdemeanor conviction. The Defendant was granted probation and ordered to refrain from contact with the victim and to pay $760 in restitution.

The Defendant filed a motion for a new trial, raising various issues including the sufficiency of the evidence and the trial court's admission of the estimate to repair the garden. As part of its sentencing decision, the trial court ordered a psychological evaluation of the Defendant. Dr. James Walker conducted the evaluation, and his report contains a recitation of numerous demonstrably false or implausible statements made by the Defendant, including that her attorney advised her to fire a gun in the psychologist's office, that the victim had altered the security footage to make the Defendant's husband appear guilty of filing a false police report, and that the Defendant had a "'missing' right arm, though she was wearing a short-sleeved blouse that revealed a largely intact right upper extremity." Dr. Walker stated that the Defendant was "unwilling or unable" to share the basis of the assault and stalking convictions. He diagnosed her with factitious disorder and narcissistic personality disorder, but he concluded that the Defendant was "so entrenched in her pathology" that psychotherapy would not be beneficial. Based on Dr. Walker's evaluation, the court found that it would not impose any further conditions on the Defendant's probationary sentence. The Defendant appeals the trial court's judgments, asserting that the trial court erred in admitting the estimate for the repair, that the evidence was insufficient to support any of the convictions, and that she was sentenced incorrectly.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support her convictions. She frames this issue by arguing that the trial court erred in not granting a motion for judgment of acquittal made after the State's proof and renewed after the jury was charged. In deciding a motion for judgment of acquittal made either at the close of the

State's case-in-chief or after the presentation of all proof, the trial court must determine the legal sufficiency rather than the weight of the evidence. *State v. Collier*, 411 S.W.3d 886, 892 (Tenn. 2013). "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). A distinction arises between a challenge to the sufficiency of the convicting evidence and a challenge to the trial court's denial of a motion to acquit only when a defendant introduces proof after the State rests its case. *See Collier*, 411 S.W.3d at 892. A motion for judgment of acquittal is waived if the defendant introduces proof after making the motion. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *State v. Rutan*, 479 A.2d 1209, 1210-11 (Conn. 1984)). When a defendant does not stand on a motion for judgment of acquittal, the appellate court may consider evidence introduced after the close of the State's case-in-chief in assessing the sufficiency of the evidence. *Id.* at 316-17. A defendant may, of course, still challenge the sufficiency of all evidence introduced at trial. *State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008). The Defendant here testified after the motion for the judgment of acquittal, and accordingly, we address the issue as one challenging the sufficiency of the convicting evidence on appeal. *See id.*

This court must set aside a conviction if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Davis*, 466 S.W.3d 49, 70 (Tenn. 2015). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The State is entitled to the strongest legitimate view of the evidence presented at trial and to all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). A conviction may be supported solely by circumstantial evidence, and the circumstantial evidence is not required to exclude every reasonable hypothesis except guilt. *State v. Tuttle*, 515 S.W.3d 282, 316 (Tenn. 2017).

- 12 -

## A. Vandalism

The Defendant was convicted of vandalism, which is accomplished when the perpetrator knowingly "[c]auses damage to or the destruction of any real or personal property of another … knowing that the person does not have the owner's effective consent." T.C.A. § 39-14-408(b)(1). As charged here, damage includes "[d]estroying, polluting, or contaminating property" or "[t]ampering with property and causing pecuniary loss or substantial inconvenience to the owner or a third person." T.C.A. § 39-14-408(a)(1)(A), (B).

### 1. Proof of Value

The Defendant asserts that the State failed to prove that the value of the damaged property was over $1,000 because the victim's actual expenditure on repairs was $760. The State asserts that the evidence was sufficient to establish the value.

The valuation of property and punishment for vandalism are determined by reference to the theft statute. T.C.A. § 39-14-408(c)(1) ("A person violating subdivision (b)(1) or (b)(3) is a principal under § 39-11-401 and shall be punished as for theft under § 39-14-105, after determining value under § 39-11-106."). "Value" is generally defined as:

> (i) The fair market value of the property or service at the time and place of the offense; or

> (ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense;

T.C.A. § 39-11-106(36)(A). The jury is tasked with determining the value of the stolen or damaged property. *State v. Dung Tran*, No. W2014-02518-CCA-R3-CD, 2015 WL 5276427, at *5 (Tenn. Crim. App. Sept. 9, 2015) (citing *State v. Hamm*, 611 S.W.2d 826, 828-29 (Tenn. 1981)). If value cannot be determined, it is deemed to be under fifty dollars. T.C.A. § 39-11-106(36)(D). The jury here was instructed to determine value under Tennessee Code Annotated section 39-11-106(36)(A). The trial court and the Defendant agreed at trial that the fair market value was not ascertainable and that valuation must be based on the replacement cost.[2]

---

[2] Cost of repairs is also an appropriate means of determining value in vandalism cases. *State v. Gentry*, 538 S.W.3d 413, 428 (Tenn. 2017); *State v. Thomas Bolton*, No. W2012-02000-CCA-R3-CD, 2014 WL 12653829, at *9 (Tenn. Crim. App. Jan. 31, 2014) (holding that the cost of repairs was a proper method of determining value in vandalism cases even though the statutory language was written in the disjunctive, and citing cases in which the cost of replacement or repairs was used even though fair market

- 13 -

The Defendant argues that the replacement cost of the property was the price actually paid by the victim. The victim testified that she paid approximately $760 to a friend who was a master gardener to replace the damaged plants and soil. She did not replace three encore azaleas, valued at about $20 each, some black-eyed Susans, valued at about $30, and an evergreen which would be approximately $30 for "a small one." The victim also testified that none of the replacement plants were comparable in size or maturity to the plants that had been killed. The evidence also included an estimate for replacing the damaged plants from Southern Land Company, which would have performed the work for $2,100.

As this court has observed before, the elements of the offense do not require the State to show that the property was actually replaced or repaired but requires "only that the cost of repair or replacement be established." *State v. John Lindsey, III*, No. E2011-00052-CCA-R3-CD, 2012 WL 5392156, at *5 (Tenn. Crim. App. Nov. 5, 2012). Here, the actual cost the victim paid was under $1,000, but the proof at trial also showed that the victim's actual cost did not restore the garden to the same condition it was in prior to the vandalism. The victim obtained an estimate of $2,100 for the repair of the garden, but she either did not have the resources or the inclination to spend $2,100 on repairs. The value of damage to property does not vary based on the repairs which an owner may decide to undertake or to forgo. *See State v. Brooks*, 909 S.W.2d 854, 858 (Tenn. Crim. App. 1995) (concluding that the evidence was sufficient to support a conviction for vandalism of property valued at over $1,000 when the victim testified that her car was initially worth $10,000, that it was worth "maybe" $4,000 or $5,000 when it was returned, and that she paid only $300 in order to get it into "driveable condition"). It would be absurd for the valuation of damages to depend solely on the idiosyncrasies of the victim performing repairs. *See Thomas Bolton*, 2014 WL 12653829, at *9 (Tenn. Crim. App. Jan. 31, 2014) (declining to impose an "absurd result" by valuing vandalism with reference to the low market value of the vandalized property rather than the cost of repairs).

value was not addressed); *see also* 7 Tenn. Prac. Pattern Jury Instr. – Crim. § 11.03(a)(G) ("In determining the value of the property vandalized, the value of the property shall be fixed at the amount of the damage, the reasonable cost of repairing the damage to the property, or the cost of replacement of the property vandalized"); *compare State v. Michael Webster*, No. M2012-00713-CCA-R3-CD, 2013 WL 2457181, at *6 (Tenn. Crim. App. June 5, 2013) (holding that in a theft case, fair market value rather than replacement cost determined value). Here, the cost of repairs and cost of replacing the property are the same, and the fair market value could not be ascertained.

Instead, the issue on appellate review is whether the record contains evidence supporting the jury's conclusion that the cost of replacing the property within a reasonable amount of time would have exceeded $1,000. We note that the Defendant challenges the admission of the estimate from Southern Land, but "the sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which may have been improperly admitted." *Gilley*, 297 S.W.3d at 763. We conclude that a rational trier of fact could have found from the Southern Land Company estimate of $2,100 that the cost of performing a complete restoration of the victim's damaged garden would have exceeded $1,000, and we accordingly conclude that the evidence is sufficient to support the jury's determination of value.

The Defendant also observes that the trial court ordered restitution only in the amount which the victim actually spent on the repair of the garden, and she argues that the trial court accordingly did not approve the verdict. However, the Defendant presented her argument that the State had not proven value over $1,000 to the trial court, and the trial court explicitly rejected the argument. The amount of restitution set by a court "is limited to the victim's pecuniary loss," but it "'does not have to equal or mirror the victim's precise pecuniary loss.'" *State v. Bottoms*, 87 S.W.3d 95, 106 (Tenn. Crim. App. 2001) (quoting *State v. Smith*, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994)). In fact, the court is required by statute also to consider a defendant's resources and future ability to pay. *State v. Jennifer Murray Jewell*, No. M2015-02141-CCA-R3-CD, 2017 WL 65242, at *5 (Tenn. Crim. App. Jan. 6, 2017) (citing T.C.A. § 40-35-304). The Defendant does not challenge the order setting restitution, and the mere fact that the restitution was set at a lower amount than that necessary to obtain the conviction does not reflect on the sufficiency of the convicting evidence. *See, e.g.*, *State v. David Allan Bohanon*, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *1, 7 (Tenn. Crim. App. Oct. 25, 2013) (affirming the trial court's determination that an individual victim's loss and restitution amount would be $575 when the defendant pled guilty to theft over $1,000 with respect to that offense but remanding for consideration of the defendant's ability to pay entire restitution ordered for three convictions); *State v. Mark A. Doolen, Jr.*, No. M2000-01953-COA-R3-CD, 2001 WL 1426557, at *2 (Tenn. Ct. App. Nov. 15, 2001) (observing that the theft statute was "enacted to determine, in accordance with the value of the property destroyed or damaged, what grade of theft an offender committed" and was not the appropriate measure of damages in a juvenile's restitution).

## 2. Proof of Mens Rea

The Defendant maintains that the State did not present sufficient evidence that her actions were committed knowingly. She argues that the State failed to prove her mental state based on her own testimony that she sprayed the same substance in her own yard without ill effect and that she expected that the sprayer she used would dilute the

- 15 -

chemical. She further argues that because the real property subject to the easement belonged to her, she did not believe that she was damaging the property of another, and that she accordingly did not act knowingly as a matter of law.

The offense of vandalism requires the State to prove that the Defendant acted knowingly:

> (b) A person commits the offense of vandalism who knowingly:

> (1) Causes damage to or the destruction of any real or personal property of another … knowing that the person does not have the owner's effective consent

T.C.A. § 39-14-408(b)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Vandalism is a result-of-conduct offense with regard to the element of causing damages. *State v. Troy Robert Whipple*, No. M2004-03047-CCA-R3-CD, 2006 WL 521425, at *11 (Tenn. Crim. App. Mar. 3, 2006). The mens rea of "knowingly" is satisfied "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b); *see also* T.C.A. § 39-11-106(20). Vandalism is a nature-of-conduct offense with respect to the ownership of the property. *See State v. Guy*, 165 S.W.3d 651, 660 (Tenn. Crim. App. 2004) (concluding that robbery contains elements that are result-of-conduct and elements that are nature-of-conduct, in particular noting that the offender "must be aware that certain circumstances exist, that he is not the owner of the property").

Whether a defendant acted knowingly is a question of fact reserved for the jury's determination. *Davis*, 466 S.W.3d at 69. "[W]hile a defendant's mental state is rarely subject to proof by direct evidence, it is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted knowingly, from surrounding facts and circumstances." *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010) (internal citations and quotations omitted). The defendant's self-serving declaration of his or her intent is only one factor for the jury to consider; the defendant's actions and the circumstances of the crime are also evidence of intent. *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993).

Here, the evidence establishes that the Defendant had engaged in a long-standing dispute with the victim over the victim's use of the easement. The Defendant in particular had complained to the Design Review Committee about the landscaping on the

- 16 -

easement in an attempt to force the victim to remove the plants. Although the Defendant made numerous allegations that the victim was using the easement improperly, the Defendant never testified that she believed that she was the owner of the personal property or vegetation on the easement. Instead, the Defendant attempted to go through an intermediary to force the victim to remove her landscaping. Mr. Crenshaw testified that he met with the Defendant to discuss the victim "possibly" moving the tree and making sure that the other plants were maintained so that the side of the home was accessible for maintenance, but he testified that he did not recall the committee requiring the victim to move the tree. As the Defendant sprayed the vegetation, her daughter kept watch on the courtyard. We conclude that a rational trier of fact could have concluded that the Defendant acted knowingly with respect to the ownership of the property when she sprayed the victim's plants in the easement area with a toxin. *See State v. Don Birdwell*, No. M2008-02313-CCA-R3-CD, 2010 WL 2977891, at *4 (Tenn. Crim. App. July 29, 2010) (concluding that the defendant's claim that he believed the victim's fence was on his property "did not serve to negate his knowing destruction" of the fence without the victim's consent).

The circumstances of the crime captured on video also support the inference that the Defendant was spraying the area in order to poison the plants. The Defendant leaned out of her upper-story window and sprayed something on the plants. Although she testified that she was spraying her home with ant-killer, the video shows that she was concentrating the spray on the vegetation, particularly the ornamental magnolia tree, and not on the house. Even if the jury credited the Defendant's testimony that the spray was an insecticide rather than an herbicide, there was evidence that the insecticide was labeled as unsafe for plants. The jury was entitled to infer from the Defendant's videotaped actions and from the circumstances surrounding the crime that the Defendant acted knowingly when she damaged the victim's plants.

### 3. Ownership of Property

The Defendant also appears to argue that she could not have vandalized the plants because she owned the property on which the plants were located. Here, the victim had an express easement which permitted her to use and enjoy the Defendant's property and which specifically required that the benefitted lot "shall maintain the plants and lawn covering of the Easement Area." The vandalism statute defines "owner" as "a person in lawful possession of property whether the possession is actual or constructive." T.C.A. § 39-14-401(3). "Property" refers to "anything of value, including, but not limited to, money, real estate, tangible or intangible personal property, including anything severed from land, library material, contract rights, choses-in-action, interests in or claims to wealth, credit, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power." T.C.A. § 39-11-106(28).

- 17 -

The Defendant presented no proof at trial that she owned the landscaping. In fact, the proof at trial established that the victim installed the landscaping when she bought the home, pursuant to an easement that required her to maintain landscaping on the Defendant's servient lot. *See Billy Butler v. Malvin Carvin Pitts, Jr.*, No. W2015-01124-COA-R3-CV, 2016 WL 561078, at *3 (Tenn. Ct. App. Feb. 12, 2016) (noting that the scope of an easement created by express grant is that which is set forth in the granting document); *see also Gordon Carroll v. John W. Belcher*, No. 01A01-9802-CH-00106, 1999 WL 58597, at *4 (Tenn. Ct. App. Feb. 9, 1999) (observing that, generally, "'the rights of the easement owner are paramount, to the extent of the easement, to those of the landowner'" (quoting 10 *Tennessee Jurisprudence*, Easements § 6 (1994)). Because the Defendant introduced no evidence at trial that she owned the plants, a rational juror could have found that the plants belonged to the victim, who bought them, planted them, and tended them.

Although the Defendant claims that her ownership of the land confers ownership of the landscaping onto her, she cites to no law that would establish her as the owner of the landscaping and plant life. We conclude that this argument is waived. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by … citation to authorities … will be treated as waived in this court.").

### B. Assault

The Defendant also asserts that the evidence was insufficient to support the conviction for assault. The Defendant contends that the victim could not have been in fear of imminent harm because the Defendant could not have come into personal contact with her from the balcony, and she argues that the victim's fear was not reasonable because there was no evidence that the Defendant actually possessed a gun. The State responds that the victim reasonably feared imminent harm after the Defendant essentially threatened to shoot her from the balcony.

The Defendant was charged with committing assault by "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury." T.C.A. § 39-13-101(a)(2). We have defined an "imminent" bodily injury in assault as one that is:

> "Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous. Something which is threatening to happen at once, something close at hand, something to happen upon the instant, close although not yet touching, and on the point of happening."

*State v. Terrance Dixon*, No. W2011-01432-CCA-R3-CD, 2012 WL 1656721, at *5 (Tenn. Crim. App. May 10, 2012) (quoting the definition of "imminent" applied in a reckless endangerment case by *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999) (quoting *Black's Law Dictionary* 750 (6th ed. 1990))). "'Imminent danger is an immediate, real threat to one's safety.'" *State v. James Craig Thomas*, No. E2013-02196-CCA-R3CD, 2014 WL 2021952, at *4 (Tenn. Crim. App. May 15, 2014) (quoting *State v. Bobby Joe Young, Jr.,* No. M2010-01531-CCA-R3-CD, 2011 WL 6291813, at *7 (Tenn. Crim. App. Dec.14, 2011)).

The Defendant told her daughter to get her gun while standing on her balcony overlooking the victim's courtyard. The victim's mobility was extremely restricted, and she characterized herself as a "sitting duck." While the Defendant could not have initiated an "imminent" person-to-person contact with the victim without climbing through a locked gate, the video demonstrates that the Defendant's threat to shoot the victim could easily have been carried out prior to the victim laboriously reaching the safety of her home. We conclude that a rational juror could have found that the threatened injury was "imminent."

The Defendant argues that the victim's fear was not reasonable because the State did not prove that the Defendant actually possessed a firearm. However, the Tennessee Supreme Court has previously concluded that actual danger is not an element of aggravated assault committed by placing the victim in reasonable fear of imminent harm:

> From an analysis of the statutory requirements of aggravated assault, we determine that the presence of danger is not an essential element of aggravated assault committed by placing another person in fear of imminent danger of death or serious bodily injury. Consequently, one can commit the offense of aggravated assault by placing another person in fear of danger even if there is no risk of danger.

*State v. Moore*, 77 S.W.3d 132, 135-36 (Tenn. 2002). Likewise, this court has concluded that, unlike reckless endangerment cases, assault cases do not require the victim to show that he or she was in a "zone of danger." *James Craig Thomas*, 2014 WL 2021952, at *4. This is because the crux of assault focuses not on whether the victim was in a zone of danger but on "whether [the victim's] fear of imminent bodily injury was reasonable." *State v. James Paris Johnson*, No. E2008-02555-CCA-R3-CD, 2010 WL 3565761, at *6 (Tenn. Crim. App. Sept. 15, 2010); *see State v. Bobby Joe Young, Jr.*, No. M2010-01531-CCA-R3-CD, 2011 WL 6291813, at *8 (Tenn. Crim. App. Dec. 14, 2011).

In *State v. Colico Walls*, the defendant threatened to "blow [the victim's] head off" with an object which two witnesses testified might have been a gun. No. W2002-00191-

CCA-R3CD, 2003 WL 1453147, at *4 (Tenn. Crim. App. Mar. 18, 2003). The victim, however, also testified that the object appeared to be "big for a gun" and that "she did not believe it was a gun, but feared that whatever it was might cause her harm." *Id.* at *1, 4. This court concluded that the evidence was insufficient to support the conviction for aggravated assault because there was no evidence that a deadly weapon was involved. *Id.* at *4. However, this court proceeded to reject the defendant's contention that the evidence was likewise insufficient to support a conviction for simple assault. *Id.* We concluded that although there was no evidence that the defendant actually possessed a deadly weapon, the victim's fear of imminent bodily injury was reasonable because "[t]he defendant uttered a threat and appeared to have an object capable of backing it up." *Id.*

The evidence here, seen in the light most favorable to the State, demonstrated that the Defendant had previously been on friendly terms with the victim and had told the victim that she owned a gun. The Defendant was on an upper front balcony, and from the corner of the balcony, she had a clear line of sight throughout the victim's courtyard. While the victim was in her garden and a considerable distance from the entrance to her home, the Defendant made shooting noises and then instructed her daughter to get her gun. The Defendant's behavior had consistently been hostile and a source of anxiety for the victim leading up to this encounter. The victim testified that she knew it would take her some time to make her way inside her home and that she feared that the Defendant would shoot her. The State did not have to demonstrate that the Defendant actually owned a gun rather than a gun-shaped toilet implement; instead, the nature of the crime was that the Defendant intentionally terrorized the victim with the reasonable fear that she would be shot. *See Moore*, 77 S.W.3d at 136 n.6; *Colico Walls*, 2003 WL 1453147, at *4; *see also State v. Rickie J. Stallings*, No. E2005-00239-CCA-R3-CD, 2006 WL 2061736, at *20-21 (Tenn. Crim. App. July 26, 2006) (rejecting the defendant's contention that because the defendant did not actually possess a weapon, the victim's fear was not reasonable and concluding that "the presence or absence of a lighter is of no consequence to the inquiry whether the victim feared imminent bodily injury, because the existence of actual danger is not required to establish the element of fear of imminent bodily injury"), *perm. app. granted, cause remanded* (Tenn. Oct. 15, 2007), *abrogated on remand on other grounds by State v. Rickie J. Stallings*, No. E2007-02324-CCA-RM-CD, 2008 WL 614831, at *5 (Tenn. Crim. App. Mar. 6, 2008). Had the Defendant actually used or displayed a deadly weapon, she would presumably have been charged with aggravated assault. *See* T.C.A. § 39-13-102(a)(1)(A)(iii). We conclude that a rational trier of fact could have found that under the circumstances, the victim's fear was reasonable.

### C. Stalking

### 1. Elements of the Offense

The Defendant contends that the evidence is insufficient to support her conviction for stalking because the State failed to establish that the victim suffered from emotional distress or that a reasonable person in the victim's position would have suffered emotional distress. She also argues that she did not have actual contact with the victim, that the instances of harassment were isolated, and that the victim was not frightened. The State responds that the evidence established the elements of the offense.

It is an offense to engage in stalking, which is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." T.C.A. § 39-17-315(a)(4), (b)(1) (2014). "Harassment" is statutorily defined as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress." T.C.A. § 39-17-315(a)(3) (2014). A course of conduct, as defined at the time of the offense, is "a pattern of conduct composed of a series of two (2) or more separate noncontinuous acts evidencing a continuity of purpose." T.C.A. § 39-17-315(a)(1) (2014). Emotional distress is "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." T.C.A. § 39-17-315(a)(2). "Unconsented contact" is also statutorily defined as:

> any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:
>
> (A) Following or appearing within the sight of that person;
> (B) Approaching or confronting that person in a public place or on private property;
> (C) Appearing at that person's workplace or residence;
> (D) Entering onto or remaining on property owned, leased, or occupied by that person;
> (E) Contacting that person by telephone;
> (F) Sending mail or electronic communications to that person; or

(G) Placing an object on, or delivering an object to, property owned, leased, or occupied by that person

T.C.A. § 39-17-315(a)(5) (2014).

The proof at trial, as relevant to the stalking charge and seen in the light most favorable to the State, established that the Defendant hung a onesie in her window in an effort to mock the victim's incontinence. The Defendant also mocked the victim's incontinence verbally, as captured on video. The Defendant began to stop her car in front of the victim's home and take pictures of the victim. She would stay in the car for half an hour, occasionally "inching" forward, staring at the victim. In July, the Defendant stopped her car so that it blocked the victim's driveway and made threatening faces at the victim until Mr. Poe approached the Defendant's car. On another occasion, the Defendant walked close to the victim's table at the club and made a guttural growl at the victim. The Defendant also followed the victim to her car at the residents' meeting, despite the fact that the Defendant was not parked near the victim. Finally, the Defendant and her daughter stood in their driveway staring menacingly at the victim until she felt it was unsafe to leave her car. After Mr. Monckton arrived to help, the Defendant attempted to intimidate him and the victim with an object which the jury could have inferred was her gun-shaped toilet plunger.

The victim testified that she was terrified of the Defendant and believed the Defendant would one day kill her. She saw her psychologist more often as a result of the harassment. The victim was afraid to sleep or go outside alone. Mr. Monckton testified that on one occasion, the victim was so frightened she could not speak when she called him for help. Mr. Kenney testified that the victim was so frightened that it affected her sleep and her health. He described the victim as "a prisoner in her own home." Mr. Monckton, Mr. Kenney, and Mr. Poe testified that the Defendant's acts were harassing and intimidating, and Mr. Monckton and Mr. Kenney said the Defendant caused them to fear for their own safety and the safety of the victim.

While the Defendant asserts that the fact that the victim was already seeing a psychologist after her husband's death means that she did not suffer mentally, the jury chose to credit the testimony of the victim and of the other State's witnesses that the victim experienced "significant mental suffering or distress" for which she sought professional treatment, and we will not disturb this finding on appeal. T.C.A. § 39-17-315(a)(2); *compare State v. Flowers*, 512 S.W.3d 161, 166 (Tenn. 2016) (reversing the conviction because the victim did not testify that he subjectively felt emotional distress). The State's evidence was also sufficient to support the jury's conclusion that a reasonable person would have felt emotional distress, particularly in light of the fact that Mr. Monckton and Mr. Kenney testified that they themselves felt threatened by the Defendant

and also feared for the safety of the victim. The Defendant highlights the victim's testimony that she was so used to the Defendant saying, "Devil, I rebuke you," to her that it did not frighten her, and the Defendant asserts that the State accordingly failed to establish an element of the offense. However, the jury credited the victim's testimony that she felt terrified, threatened, and harassed by the sum total of the Defendant's actions. T.C.A. § 39-17-315(a)(4) (requiring the State to show that the victim felt "terrorized, frightened, intimidated, threatened, harassed, or molested").

The proof also showed that the Defendant had unconsented contact with the victim when she growled at her, followed her to her car after a meeting, glared at her from the driveway, used her car to inch up in front of the victim's home and take pictures of the victim, blocked the victim's driveway with her car, and mocked her incontinence. Contrary to the Defendant's contention, "contact" under the statute does not require physical contact. T.C.A. § 39-17-315(a)(5). The summary of the proof above also demonstrates that a reasonable trier of fact could have found that the Defendant's numerous acts amounted to a pattern of conduct which evidenced a continuity of purpose. T.C.A. § 39-17-315(a)(1). Accordingly, the evidence was sufficient to support the verdict.

## 2. Statutory Exclusion of Constitutionally Protected Activity

The Defendant also asserts that the acts forming the basis of her conviction constituted protected speech and that her act of parking in front of the victim's house was likewise constitutionally protected. The statutory definition of harassment excludes "constitutionally protected activity or conduct that serves a legitimate purpose." T.C.A. § 39-17-315(a)(3). The Defendant's legal argument is not a challenge to the constitutionality of the statute but an argument that the State, as a matter of law, failed to present sufficient evidence of harassment because her conduct is statutorily excluded as constitutionally protected activity or activity which serves a legitimate purpose.

The Defendant argues that she is being punished for exercising her right to free speech. She argues that she enjoys a constitutional right to move from one place to another and that she cannot be punished for parking on a street or loitering in a parking lot. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Likewise, under the Tennessee Constitution, "[t]he free communication of thoughts and opinions, is one of the invaluable rights of man and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Tenn. Const. art. I, § 19. The free speech protections of the Tennessee Constitution have been interpreted to be at least as broad as the First Amendment. *State v. Mitchell*, 343 S.W.3d 381, 392 n.3 (Tenn. 2011). "In order to be permissible, any regulation of free speech 'must serve an important and

substantial public interest, wholly divorced from the suppression of free speech,' and the restrictions 'must be no greater than is essential to the furtherance of that interest.'" *Id.* (quoting *H & L Messengers, Inc. v. City of Brentwood*, 577 S.W.2d 444, 452 (Tenn. 1979)).

However, "'the right of free speech is not absolute at all times and under all circumstances.'" *Id.* at 392 n.4 (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571 (1942)). "The First Amendment … is not an impenetrable shield which protects any speech or conduct, whatsoever, with disregard to its harm and effect. Despite our First Amendment rights, we are not free to harm others under the guise of free speech." *State v. Whitesell*, 13 P.3d 887, 900-01 (Kan. 2000). "'As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the State has greater latitude to regulate expression.'" *Id.* at 901 (quoting *People v. Borrelli*, 91 Cal. Rptr. 2d 851, 859 (Cal. Ct. App. 2000)). Exceptions to constitutionally protected speech include obscenity, libel, and "'"fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Mitchell*, 343 S.W.3d at 392 n.4 (emphasis omitted) (quoting *Chaplinsky*, 315 U.S. at 572). Furthermore, "'[s]peech integral to criminal conduct is not protected.'" *Purifoy v. Mafa*, 556 S.W.3d 170, 191 (Tenn. Ct. App. 2017) (quoting *Mitchell*, 343 S.W.3d at 394); *see also State v. Nicole Flowers*, No. M2014-01744-CCA-R3-CD, 2015 WL 5676860, at *6-7 (Tenn. Crim. App. Sept. 28, 2015), *rev'd on other grounds*, 512 S.W.3d 161 (Tenn. 2016). The United States Supreme Court has rejected the contention that "the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949); *see also United States v. Stevens*, 559 U.S. 460, 469 (2010) (noting that the Constitution does not prohibit restrictions on certain narrow classes of speech, including speech integral to criminal conduct). Speech is not protected "when it is the very vehicle of the crime itself." *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970).

"'[F]ree speech does not include the right to cause substantial emotional distress by harassment or intimidation,'" and "[w]ords concerning surveilling or harassing a person to intimidate are not entitled to protection as free speech." *Purifoy*, 556 S.W.3d at 191-92 (quoting *State v. Cooney*, 894 P.2d 303, 307 (Mont. 1995)). Likewise, conduct intended only to annoy and inconvenience is not necessarily constitutionally protected. *People v. Holt*, 649 N.E.2d 571, 581 (Ill. App. Ct. 1995); *see also Colten v. Kentucky*, 407 U.S. 104, 109 (1972) (upholding the state court's conclusion that the defendant had no constitutional right to engage in conduct intended only to cause inconvenience and annoyance by observing the issuance of a traffic ticket, engaging the officer in conversation, and refusing to move).

In *Purifoy*, the defendant challenged an order of protection granted to the plaintiff after the defendant engaged in stalking, and the defendant asserted that he was merely exercising his right to free speech. *Id.* at 175, 191. The Court of Appeals concluded that his repeated posting of videos and written content was "clearly meant to harass, degrade, intimidate, threaten, and humiliate" the victim, who suffered fear and emotional distress, and that "[t]his was not protected free speech that was exempt from the stalking statute's definition of harassment." *Id.* at 192. Likewise, in *Nicole Flowers*, the defendant argued that the signs she posted about the father of her child were constitutionally protected speech. 2015 WL 5676860, at *6. This court rejected that contention, holding that the defendant did "not enjoy constitutional protection for posting these signs because her right to free speech is subject to the valued interests of preventing the offense of stalking and deterring conduct that often escalates to violence." *Id.* at *7. This court likewise found that her acts served no legitimate purpose. *Id.* On appeal, the Tennessee Supreme Court reversed on other grounds and did not reach the issue of whether the speech was constitutionally protected. *Flowers*, 512 S.W.3d at 162.

The evidence here shows that the Defendant's speech consisted entirely of messages mocking the victim's incontinence, calling her a devil, and making implicit threats. We conclude that this speech was not constitutionally protected, as it was integral to the Defendant's criminal conduct, had no social value, and was entirely aimed at harassing the victim in order to cause her emotional distress. *See Purifoy*, 556 S.W.3d at 192 (concluding that the statute did not regulate the content of speech so much as the manner in which the communication was made, "i.e., … through repeated unconsented contact reasonably causing the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested"); *see also Whitesell*, 13 P.3d at 903 (concluding that the defendant's act of sending the victim a Bible with threatening messages was not protected religious activity or protected speech); *Cooney*, 894 P.2d at 307 (concluding that the defendant's harassment and intimidation lacked any social value and was not protected under the First Amendment); *Matter of Welfare of A.J.B.*, 910 N.W.2d 491, 500 (Minn. Ct. App. 2018) (the juvenile defendant's act of tweeting derogatory comments referencing his classmate's autism was unprotected speech integral to criminal conduct); *United States v. Gonzalez*, 905 F.3d 165, 193 (3d Cir. 2018) (concluding that the defendant's act of falsely accusing the victim of sexual molesting children was unprotected speech because it was speech integral to criminal conduct, serving no legitimate purpose other than to harass and intimidate, and forming part of a course of conduct intended to cause the victim distress and obtain custody of the victim's children).

The Defendant also asserts that her act of parking and appearing near the victim in public were constitutionally protected and served a legitimate purpose. She cites *City of Chicago v. Morales*, for the proposition that she has a due process right to remain in a public place. 527 U.S. 41, 53-54 (1999) (noting that there is a due process right to loiter

for innocent purposes and concluding that law criminalizing gang loitering was unconstitutionally vague).  However, the language in *Morales* "cannot be read as the Supreme Court's mandating that a right to loiter in *all* places deemed 'public' is a fundamental liberty interest."  *Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 772 (7th Cir. 2004).  Indeed, "'the right to travel cannot conceivably imply the right to travel whenever, wherever and however one pleases.'"  *Snowden v. State*, 677 A.2d 33, 37 (Del. 1996) (quoting *Lutz v. City of York*, 3rd Cir., 899 F.2d 255, 269 (1990)).

Contrary to her assertions, the Defendant did not merely engage in activities with a legitimate purpose such as parking on the street, attending a residents' meeting, and eating at the golf club.  Instead, the evidence, seen in the light most favorable to the State, shows that the Defendant stopped her vehicle in front of the victim's home and stayed in the vehicle for thirty minutes while staring menacingly at the victim, occasionally inching the vehicle forward, and taking photographs.  She followed the victim out of a meeting and stood near her and glared, although the Defendant's own car was not parked in the vicinity.  She also growled at the victim at the golf club.  We conclude that a rational trier of fact could have found that these activities served no legitimate purpose but were calculated to harass, intimidate, and terrorize the victim.  As such, they were not constitutionally protected acts.  *State v. Holbach*, 763 N.W.2d 761, 766 (N.D. 2009) (the defendant's conduct did not consist merely of shopping, getting gas, and going to a restaurant but was intentional conduct aimed at causing the victim fear, and his conduct was accordingly not constitutionally protected); *Goosen v. Walker*, 714 So. 2d 1149, 1150 (Fla. Dist. Ct. App. 1998) (concluding that the defendant's conduct of videotaping the neighbor constituted stalking and was not constitutionally protected conduct); *Snowden*, 677 A.2d at 38 (defendant's act of following the victim on public roads was not constitutionally protected behavior); *Holt*, 649 N.E.2d at 581 (concluding that the defendant's act of skating at a public ice rink was not constitutionally protected because the basis of his conviction was surveilling the victim during her reserved skating times with the intent to embarrass and annoy her).

We conclude that the statutory definition of harassment was satisfied and that the Defendant's conduct and speech was not exempt as constitutionally protected or as activity which serves a legitimate purpose.

## II. Admission of the Estimate from Southern Land Company

The Defendant asserts that the trial court erred when it permitted the estimate for repairs from Southern Land Company because the victim ultimately hired a friend to complete the work.  The State argues that the issue is waived because the Defendant did not object to the estimate at the time that it was admitted into evidence and that in any event, the evidence was not admitted in error.

The victim testified on direct examination that she got an estimate for the repair of the garden from Southern Land Company. The Defendant, anticipating that the victim would testify to the amount of the estimate, objected on a hearsay basis. At this point, the victim merely authenticated the document containing the estimate, which was marked for identification. When Ms. Tomlin testified about the estimate, defense counsel asked to approach the court, and there was a conference out of the hearing of the jury. Because this conference was not transcribed, the basis of defense counsel's objection was not put into the record. The record does reflect that the trial court noted that the exhibit would be moved into evidence over the objection of the defense. The appellant has the duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). When the record is inadequate or does not contain the information necessary to review an issue, we presume that the trial court's judgments were correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). We note, however, that during the discussion of jury instructions on the last day of trial, defense counsel argued that the value of the property did not, as a matter of law, exceed the price the victim had paid her friend to replace it. Defense counsel contended that the estimate from Southern Land Company did not reflect the value of the property because the victim did not hire Southern Land. The court observed that defense counsel had "made the argument at the time[] the testimony was proffered" and that the court had nevertheless "believed that it was appropriate to allow the introduction of the evidence." The trial court noted that the jury could consider both the actual cost paid and the estimate in assessing value. We conclude that the record adequately establishes that the defense objected to the admission of the estimate on the basis that the company providing the estimate did not ultimately perform the repairs.

The Defendant argues that the estimate should not have been admitted because the victim ultimately paid significantly less to have a friend restore her garden. According to the Defendant, the estimate is therefore not relevant to valuation. If relevant, the Defendant asserts that its probative value was substantially outweighed by prejudice because the estimate was "grossly misleading," particularly considering that Ms. Tomlin testified that the plants were sold forty percent above the wholesale price. The State asserts that the evidence is relevant and that the trial court did not abuse its discretion in admitting the evidence.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible, whereas irrelevant evidence is generally inadmissible. Tenn. R. Evid. 402. Even evidence which passes the test of relevancy may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion

of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Like other decisions regarding the admissibility of evidence, decisions regarding the relevance of evidence are reviewed for abuse of discretion. *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *State v. Burlison*, 868 S.W.2d 713, 720 (Tenn. Crim. App. 1993) ("Whether or not the probative value of evidence is substantially outweighed by the danger of confusion of the issues, or misleading the jury is left to the sound discretion of the trial judge.").

Ms. Tomlin testified that she worked as a horticulturalist for Southern Land Company, that she performed all the "flower design" for the subdivision, and that Southern Land Company was also occasionally hired to complete landscaping work for residents' private courtyards. Ms. Tomlin gave the victim an estimate for the cost of repairing her garden. The estimate included plants valued at $750, and Ms. Tomlin testified that Southern Land Company bought the plants at wholesale prices and then marked them up approximately forty percent. The estimate also included a $1,200 charge for labor and equipment rental and $150 for soil and mulch. The victim testified that she paid a friend approximately $760 to replace most of the plants in her garden but that she did not replace all of the plants. Furthermore, none of the replacement plants were comparable in maturity or size to the plants which had died.

The trial court did not abuse its discretion in concluding that the estimate of repair from Southern Land Company was relevant to establishing the value. The estimate had a tendency to make it either more or less probable that the cost of replacing the property exceeded $1,000. *See State v. John Sears*, No. W2017-00938-CCA-R3-CD, 2018 WL 4340222, at *8 (Tenn. Crim. App. Sept. 10, 2018) (concluding that "the testimony was relevant because it has a tendency to make the determination of the value of the stolen property more probable"), *perm. app. denied* (Tenn. Jan. 18, 2019). Neither is the estimate "grossly misleading" because the company bought plants at wholesale prices but sold them for a higher cost. The evidence shows that Southern Land Company performed similar work for other homeowners in the subdivision, and the Defendant does not assert that the estimate was somehow fraudulent. The fact that the victim either did not have the ability or the inclination to fund a complete restoration of her property does not lessen the relevance of the estimate she received on the value of the property which the Defendant damaged. The jury was able to consider both the actual cost of restoration and the estimate in determining the value of the property. *See id.* (noting that "the jury could compare [the victims'] testimony with the testimony of the real estate experts" in determining value). The trial court did not abuse its discretion.

## III. Application of the Savings Statute

The Defendant's brief assumes that if the property is valued at $1,000 or less, then her crime would be a Class A misdemeanor and that if the property is valued at over $1,000 but less than $2,500, her crime would be a Class E felony. The State cites to *State v. Ashley N. Menke*, No. M2017-00597-CCA-R3-CD, 2018 WL 2304275, at *1 (Tenn. Crim. App. May 21, 2018), *perm. app. granted* (Tenn. Oct. 11, 2018), for the proposition that the savings statute would not apply to the Defendant's crimes but notes that there is contrary authority. At oral argument, the Defendant argued that this court should rely on the contrary authority cited by the State to conclude that the savings statute applies.

Issues of statutory construction present questions of law that this court reviews de novo without a presumption of correctness. *State v. Edmonsond*, 231 S.W.3d 925, 927 (Tenn. 2007). The appellate court must give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016). The legislative intent is ascertained "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000). The court "may look to the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005) (internal quotation marks and citations omitted). When the language of a statute is clear and unambiguous, this court "must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language and, in that instance, we enforce the language without reference to the broader statutory intent, legislative history, or other sources." *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009). When a statute is ambiguous, the reviewing court may look to the statutory scheme, the history of the legislation, and other sources to discern the meaning of the legislation. *Waters v. Farr*, 291 S.W.3d 873, 881 (Tenn. 2009). "Penal statutes are to be construed giving fair import of their terms in a way which promotes justice and effectuates the objectives of the criminal code." *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008) (citing Tenn. Code Ann. § 39-11-104). "Every word in a statute 'is presumed to have meaning and purpose, and should be given full effect if so doing does not violate the obvious intention of the Legislature.'" *Waters*, 291 S.W.3d at 881 (quoting *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005)).

At the time the offense was committed, vandalism was a Class A misdemeanor if the value of the property was $500 or less, a Class E felony if the value was more than $500 but less than $1,000, and a Class D felony if the value of the property was $1,000 or more but less than $10,000. T.C.A. §§ 39-14-408(c)(1), 39-14-105(a) (2015). Effective

- 29 -

January 1, 2017,[3] vandalism became a Class A misdemeanor if the value of the property was $1,000 or less and a Class E felony if the value was more than $1,000 but less than $2,500. T.C.A. § 39-14-105(a) (2017). The Defendant's trial and sentencing took place after the effective date of the new statute.

Generally, a sentence is imposed "pursuant to the statute in effect at the time of the offense." *State v. Smith*, 893 S.W.2d 908, 919 (Tenn. 1994). However, under Tennessee Code Annotated section 39-11-112, a subsequent statute will apply to sentencing if it provides for a lesser penalty:

> When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense. Except as provided under § 40-35-117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.

T.C.A. § 39-11-112.

This court has issued several opinions addressing whether the amendment of the theft statute constituted an act which "provides for a lesser penalty" and accordingly requires the application of the "subsequent act," and the issue is currently under review by the Tennessee Supreme Court. *State v. Steven Michael Odom*, No. W2018-00634-CCA-R3-CD, 2019 WL 1126068, at *9 (Tenn. Crim. App. Mar. 12, 2019); *Ashley N. Menke*, 2018 WL 2304275, at *1; *State v. Steven Swinford*, No. E2017-01164-CCA-R3-CD, 2018 WL 1831126, at *8 (Tenn. Crim. App. Apr. 17, 2018) *no perm. app. filed*; *State v. Michael Eugene Tolle*, No. E2017-00571-CCA-R3-CD, 2018 WL 1661616, at *1-2 (Tenn. Crim. App. Mar. 19, 2018), *perm. app. granted* (Tenn. Aug. 9, 2018); *State v. Charles Keese*, No. E2016-02020-CCA-R3-CD, 2018 WL 1353697, at *7 (Tenn. Crim. App. Mar. 15, 2018), *perm. app. granted* (Tenn. Aug. 9, 2018). Most of these cases have concluded that the savings statute does apply to allow a defendant to be sentenced under the revised theft statute.

---

[3] "For the purpose of promulgating rules, policies, forms, and procedures and making necessary provisions for the implementation of this act," the effective date for the legislation was "upon becoming law," whereas the effective date was January 1, 2017, "[f]or all other purposes." 2016 Pub. Acts ch. 906, § 17. This issue does not involve promulgating rules, policies, forms, and procedures or making necessary provisions for implementing the law.

In *State v. Charles Keese*, the trial court sentenced the defendant under the revised statute and the State argued in part that the savings statute would not apply to Tennessee Code Annotated section 39-14-105 because the statute was not a sentencing provision. 2018 WL 1353697, at *7. This court noted that "[t]he amendment to Code section 39-14-105 altered only the relationship between the value of property taken during a theft and offense classification." *Id.* at *4. The court in *Charles Keese* cited to the Sentencing Commission Comments, which state that Tennessee Code Annotated section 39-14-105 "provides the *punishment* for the offenses of theft. These offenses are *punished* according to the value of the property or services obtained." *Id.* at *8 (quoting T.C.A. § 39-14-105, Sentencing Comm'n Cmt. (emphasis in *Charles Keese*)). The court observed that property was statutorily defined as anything of value, and that by establishing that the defendant took property, the State would also be establishing that the property had some value. *Id.* at *8-9 (citing T.C.A. §§ 39-11-103, -106). The court noted that "'[n]othing in [Code section] 39-14-103 which defines the offense of theft requires the [S]tate to prove the specific value of the property taken. Rather, the [S]tate merely has to introduce evidence from which a jury could conclude that the property has some value.'" *Id.* at *9 (quoting *State v. Hill*, 856 S.W.2d 155, 156 (Tenn. Crim. App. 1993)). The opinion likewise cited to the fact that the "the gravamen of the Public Safety Act of 2016 is the amendment of various sentencing provisions and that the legislature identifies the subject of HB2576, which became the Public Safety Act of 2016, as 'sentencing.'" *Id.* at *9 n.4. *Charles Keese* concluded that section 105 "supplies a *penalty* to be imposed that is commensurate with the value as established by the evidence," and that this section "falls squarely within the 'exception' to Code section 39-11-112." *Id.* at *9. After concluding that the savings statute did apply to the revisions to Tennessee Code Annotated section 39-14-105, the court nevertheless reversed the trial court's application of the statute because the defendant was sentenced before the statute's effective date. *Id.* at *10-11.

In *State v. Michael Eugene Tolle*, the defendant's probation was revoked and the trial court resentenced him under the new statute. 2018 WL 1661616, at *1-2. *Michael Eugene Tolle* used identical reasoning to reject the State's argument that the savings statute did not apply to the revised theft offenses because it was not a sentencing statute. *Id.* at *9-10. The court nevertheless found that the trial court erred in sentencing the defendant under the new act because the trial court, in revoking probation, could not alter the class of the conviction. *Id.* at *11.

In *State v. Steven Swinford*, the defendant committed vandalism, and the trial court sentenced the defendant under the revised theft statute. 2018 WL 1831126, at *8. This court concluded that "it is clear the amended theft statute provides the defendant with a 'lesser penalty' for his vandalism conviction, thus invoking the criminal saving's statute." *Id.* at *8. The *Steven Swinford* court focused on the vandalism statute's language

directing that the offender "*shall be punished* as for theft under § 39-14-105" in reaching the conclusion that the theft statute is applied to the offense of vandalism only at the punishment phase. *Id.* at *10 (quoting T.C.A. § 39-14-408(c)(1) (emphasis in *Swinford*)). Like *Charles Keese* and *Michael Eugene Tolle*, *Steven Swinford* cited to the Sentencing Commission Comments. The court concluded that because the defendant was sentenced after the new statute went into effect and because the new statute provided a lesser penalty, the new statute should apply. *Id.* at *10; *see also Steven Michael Odom*, 2019 WL 1126068, at *9 (concluding that the amended theft statute applied and sua sponte modifying the sentence); *Martinos Derring*, 2019 WL 244471, at *15 (concluding that offense would have been a Class D felony under either statute and refusing to reach the issue); *State v. Harley Crosland*, No. M2017-01232-CCA-R3-CD, 2018 WL 3092903, at *3 (Tenn. Crim. App. June 21, 2018), *perm. app. filed* (concluding that the State had no right to appeal but remanding for a corrected judgment form to reflect that the misdemeanor sentence imposed was for a Class A misdemeanor rather than a Class E felony).

The State acknowledges that the weight of authority lies against it but cites to *Ashley N. Menke*, where a panel of this court concluded that the savings statute did not apply to the revised theft statute. 2018 WL 2304275, at *1. In *Ashley N. Menke*, this court focused on prior opinions which had held that "value is an element of the offense of theft." *Id.* at *3. *Ashley N. Menke* reasoned that the revised statute changed the essential elements of the offenses, essentially creating a new and different offense. *Id.* at *5. The court noted that the punishment for Class A misdemeanor, Class E felony, and Class D felony theft remained constant while the elements of those offenses changed. *Id.* at *6. Observing that the jury determines value only after it has determined beyond a reasonable doubt that the defendant committed theft, the court noted that the determination of value was "'necessary to assess the class of an offense in this code or the level of punishment.'" *Id.* at *3 (quoting T.C.A. § 39-11-115). *Ashley N. Menke* likewise noted that the Legislature explicitly provided for retrospective application in some instances when it enacted the Tennessee Criminal Sentencing Reform Act of 1989, and the court concluded that the omission of a like provision in the revised theft statute meant that the Legislature did not intend for the revised provisions to be applied. *Id.* at *5 (citing T.C.A. § 40-35-117(b)). The Court concluded that the defendant had committed the crime and pled guilty to Class D felony theft, and that the sentence she received under the revised statute was accordingly illegal. *Id.* at *7. *Ashley N. Menke* rejected the notion that the Sentencing Commission Comments indicated that 39-14-105 provides the punishment for the offense of theft, instead reasoning that the statute merely provides a system for grading theft according to the value of the property. *Id.* at *7.

We are persuaded by the reasoning in *Charles Keese*, *Michael Eugene Tolle*, and *Steven Swinford*. The statute criminalizing vandalism provides for the elements of the

offense and then states that the offense "*shall be punished* as for theft under § 39-14-105, after determining value under § 39-11-106." T.C.A. § 39-14-408(c)(1) (emphasis added). The Sentencing Commission Comments identify section 39-14-105 as a statute which "provides the punishment for the offenses of theft." T.C.A. § 39-14-105, Sentencing Comm'n Cmt. The statute itself notes that offenses may be aggregated for "any offense for which *the punishment* is determined pursuant to this section." T.C.A. § 39-14-105(b) (emphasis added). The statutory provisions relevant to theft also provide that when determination of value is "necessary to *assess the class of an offense* in this code or *the level of punishment*, the determination of value shall be made by the trier of fact beyond a reasonable doubt." T.C.A. § 39-11-115 (emphasis added); *see also Gentry*, 538 S.W.3d at 427 (framing issue of valuation as, "For sentence classification purposes, what is the proper valuation method for theft of real property?"). We conclude that the savings statute, which is triggered "in the event the subsequent act provides for a lesser penalty," applies to the revisions in Tennessee Code Annotated section 39-14-105 providing for penalties for violation of the theft statute and that the Defendant's offense must accordingly be reduced to a Class E felony. T.C.A. § 39-11-112.

We observe here that the Defendant was indicted on January 11, 2016, and charged with vandalism of property valued over $1,000 but less than $10,000, which the indictment described as a Class E felony. Vandalism of property valued over $1,000 but less than $10,000 should properly have been described as a Class D felony at that time. T.C.A. § 39-14-105(a) (2016). The Defendant was tried and convicted after the revised statute, making vandalism of property valued over $1,000 but under $2,500 a Class E felony, went into effect. The judgment form describes the indicted and conviction offense as a Class D felony. *See State v. Larry Edward Englet*, No. W1999-00283-CCA-R3-CD, 2000 WL 556479, at *3 (Tenn. Crim. App. May 8, 2000) (reference to statute for felony marijuana possession rather than misdemeanor marijuana possession sufficiently put the defendant on notice of the charged crime); *State v. Hilliard*, 906 S.W.2d 466, 470 (Tenn. Crim. App. 1995) (the defendant could only be convicted of a Class C rather than a Class B felony because of the failure to allege the amount of cocaine in indictment). The Defendant does not raise as error the mistake in the language of the indictment, and given that we have determined that her offense must be reduced to a Class E felony, we do not address it. Instead, having concluded that the savings statute applies to the revisions to Tennessee Code Annotated section 39-14-105, we remand for resentencing on the vandalism conviction as a Class E felony.

## CONCLUSION

Because the savings statute applies to the revisions to Tennessee Code Annotated section 39-14-105(a), which provides for a lesser penalty for vandalism, we remand for resentencing on the vandalism conviction. We likewise remand for completion the

- 33 -

judgment form for the Defendant's assault conviction, because the form is incomplete in that the conviction offense and class of offense are not filled out, the form does not indicate that the Defendant was found guilty by a jury, and the box indicating that she was sentenced to supervised probation is not checked. The trial court's judgments are otherwise affirmed.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE